

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY,
          Plaintiff,

-vs-                                                          Case No. A-15-CA-89-SS

GIGANEWS, INC. and LIVEWIRE SERVICES,
INC.,
          Defendants.

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff St. Paul Fire and Marine Insurance Company's Motion for Summary Judgment [#28]; Defendants Giganews, Inc. and Livewire Services, Inc.'s Cross-Motion for Summary Judgment and Response [#37] thereto; Plaintiff's Reply in Support of its Motion for Summary Judgment and Response [#43] thereto; and Defendants' Reply in Support of their Cross-Motion for Summary Judgment [#44]. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

This is an insurance coverage dispute between Plaintiff St. Paul Fire and Marine Insurance Company and its insureds, Defendants Giganews, Inc. and Livewire Services, Inc. The dispute arises out of copyright claims asserted by Perfect 10, Inc., an adult entertainment company, in an underlying lawsuit filed in California federal court (the Underlying Suit). St. Paul seeks a judicial declaration it had no contractual duty to defend Defendants in the Underlying Suit pursuant to a

commercial general liability policy issued by St. Paul (the Policy). Defendants believe they were entitled to a defense, and have filed a counterclaim for breach of contract, violations of the Texas Insurance Code, and breach of the duty of good faith and fair dealing, and seeking reasonable attorney's fees. The case is now before the Court on cross-motions for summary judgment. For the following reasons, the Court finds summary judgment is due to be granted in favor of St. Paul as to all claims.

## Background

### I.    The Underlying Lawsuit

On March 28, 2011, Perfect 10 filed the Underlying Suit, styled *Perfect 10 Inc. v. Giganews, Inc., Livewire Services, Inc. and Does 1 through 100*, in the United States District Court for the Southern District of California. The case was subsequently transferred to the United States District Court for the Central District of California. The original complaint asserted claims for copyright infringement, trademark infringement, trademark dilution, unfair competition, and violations of rights of publicity. *See* Compl. [#1] (Underlying Compl.), *Perfect 10 Inc. v. Giganews, Inc. et al.*, 2:11-cv-07098-AB-JPR (C.D. Cal. filed Mar. 28, 2011) (Underlying Suit). On March 26, 2013, Perfect 10 filed an amended complaint, which asserted only claims for copyright infringement. First Am. Compl. [#101] (Am. Underlying Compl.), Underlying Suit. The Underlying Complaint and Amended Underlying Complaint are based on the same facts and can be summarized as follows.[1]

---

[1] While the factual allegations in each complaint are similar, under Texas law, the insurer's duty to defend is determined "by examining the latest, and only the latest, amended pleadings." *Rhodes v. Chicago. Ins. Co.*, 719 F.2d 116, 119 (5th Cir. 1983) (interpreting Texas law); *see also John Deere Ins. Co v. Truckin' U.S.A.*, 122 F.3d 270, 273 n.1 (5th Cir. 1997). Consequently, the Court will recite the relevant facts based on allegations contained in the Underlying Amended Complaint.

Giganews is a USENET service provider that owns and operates the websites giganews.com and supernews.com.[2] Giganews sells internet users monthly subscription access to electronic media stored on USENET servers. *Id.* ¶¶ 5, 23–32. Giganews owns and operates various USENET servers, which store electronic content uploaded by USENET users. *Id.* ¶ 26. Livewire is also a USENET service provider, but does not own any of its own USENET servers. Instead, Livewire contracts with Giganews for USENET content, which it then sells to its customers for a monthly fee. *Id.* ¶¶ 6, 59. According to their Digital Millennium Copyright Act (DMCA) filings, Defendants' operations are located in Austin, Texas. *Id.* ¶ 7. Giganews' USENET servers are also located in Austin. *Id.* ¶ 8.

Perfect 10 Inc. is an adult entertainment company. *Id.* ¶ 4, 13–17. Perfect 10 produces, markets, and sells adult entertainment products, including photographs, magazines, videos, and other merchandise, and owns thousands of copyrighted photographs, videos, and other materials. *Id.* ¶¶ 4, 13, 18. Perfect 10 also owns and operates the website perfect10.com. *Id.* ¶ 16. Perfect 10 sells access to copyrighted content on this website for a membership fee of $25.50 per month and Perfect 10's revenues are predominantly derived from this source. *Id.* ¶¶ 16–17. Perfect 10 invests substantial sums of money, time, effort, and talent to produce its copyrighted adult entertainment products, and the success of Perfect 10's business is almost entirely dependent on its intellectual property rights. *Id.* ¶¶ 18, 22.[3]

---

[2] The USENET is a worldwide system of online discussion boards known as "newsgroups." Each newsgroup provides an online platform for people with similar interests to communicate. Users can also post electronic files containing electronic media directly to a "newsgroup." These files, known as "articles," can then be downloaded and viewed using special browsing software. *See, e.g. Sefton v. Jew*, 201 F. Supp. 2d 730, 737 n.3 (W.D. Tex. 2001); *Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 549 (N.D. Tex. 1997).

[3] Perfect 10 also alleges it is the "owner of the valuable and well-known Perfect 10 family of trademarks, including but not limited to PERFECT 10, PERFECT10.COM, and P10," which "are used in commerce by Perfect 10 on and in connection with the sale of its products and services, including PERFECT 10 magazine and perfect10.com." *Id.* ¶ 19. Perfect 10 claims it "has spent millions of dollars advertising and promoting the Perfect 10 Marks and the Perfect 10 products and services bearing these marks" and "has built and owns the valuable goodwill symbolized by the

Perfect 10 alleges "Giganews has at least 10,000,000 customers" to whom it "sells access to at least 9,000,000,000,000,000 bytes (9,000 trillion bytes) of stolen movies, songs, computer software, images, and other material . . . , [including] virtually every major popular movie, popular song, popular software program, and image ever created, for anywhere from $4.99 per month up to $34.99 a month, depending on the amount of material desired by the user and the speed of delivery." *Id.* ¶¶ 5, 24. Livewire's service apparently operates in a substantially similar way, selling the material it receives from Giganews to subscribers at different prices, depending upon usage. *Id.* ¶ 59. In exchange for this payment, Giganews provides its customers with a username and password, which can be used to log in to the USENET via a newsreader/browser program such as Giganews's proprietary "Mimo" browser. *Id.* ¶ 27. Once logged in, customers can use the newsreader's search functions to locate and view specific media on the USENET servers. *Id.* ¶¶ 24, 29–32. Using these search functions, Giganews and Livewire customers can download and view a massive amount of Perfect 10 copyrighted materials, including but not limited to all of the material Perfect 10 publishes on its website in a given year or complete versions of Perfect 10 magazines. *Id.* ¶¶ 30, 31.

In this way, Perfect 10 alleges Defendants knowingly reproduce and publicly display thousands of Perfect 10 copyrighted images, which Giganews stores on its servers and offers to its customers. *Id.* ¶ 33. Perfect 10 claims Defendants have caused and induced the unauthorized copying, reproduction, public display, distribution, and sale of more than 267,000 Perfect 10 copyrighted materials without its consent. *Id.* ¶¶ 65, 72. According to Perfect 10, while the USENET may once have contained a significant amount of legal materials, "Defendants' ability to

---

Perfect 10 Marks." *Id.*

generate monthly subscriptions and revenues is based almost exclusively on the demand for pirated copyrighted works." *Id.* ¶ 55.

On November 14, 2014, summary judgment was entered in favor of Giganews and Livewire on Perfect 10's copyright claims. *See* Nov. 14, 2014 Order [#619], Underlying Suit; Nov. 14, 2014 Order [#620], Underlying Suit. These decisions are currently on appeal to the Ninth Circuit.

## II. The Policy

Defendants are both named insureds under the Policy, which was issued by St. Paul and covered the one-year term from March 15, 2009, to March 15, 2010. The Policy provides commercial general liability coverage with $2 million in aggregate policy limits and umbrella excess commercial general liability coverage with $5 million in limits. Pl.'s Mot. Summ. J. [#28-4] Ex. A-1 (the Policy) at 100, 215. Pursuant to the Policy terms, St. Paul has a duty to defend against a claim or suit for covered injury or damage. *See id.* at 105. The Policy provisions relevant to coverage are as follows:

> **What This Agreement Covers**
>
> **Advertising injury liability**. We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:
> • results from the advertising of your products, your work, or your completed work; and
> • is caused by an advertising injury offense committed while this agreement is in effect.
>
> *Advertising injury* means injury, other than bodily injury or personal injury, that's caused by an advertising injury offense.
>
> *Advertising injury offense* means any of the following offenses: . . .
> • Unauthorized use of any advertising material, or any slogan or title, of others in your advertising.
>
> *Advertising* means attracting the attention of others by any means for the purpose of:
> • seeking customers or supporters; or

>    •    increasing sales or business.
>
> *Advertising material* means any covered material that:
> •    is subject to copyright law; and
> •    others use and intend to attract attention in their advertising.
>
> *Slogan* means a phrase that others use and intend to attract attention to their advertising.
>
> But we won't consider slogan to include a phrase used as, or in, the name of:
> •    any person or organization, other than you;
> •    any business, or any of the premises, products, services, work, or completed work, of any person or organization other than you.
>
> *Title* means a name of a literary or artistic work.

*Id.* at 104–05. The Policy also contains the following exclusion:

> **Intellectual property**. We won't cover injury or damage or medical expenses that result from any actual or alleged infringement or violation of any of the following rights or laws:
> •    Copyright.
> •    Patent.
> •    Trade dress.
> •    Trade name.
> •    Trade secret.
> •    Trademark.
> •    Other intellectual property rights or laws.
>
> Nor will we cover any other personal injury or advertising injury that's alleged in any claim or suit which also alleges any such infringement or violation.
>
> But we won't apply this exclusion to bodily injury or property damage that results from your products or your completed work.
>
> Nor will we apply this exclusion to advertising injury that results from the unauthorized use of any:
> •    copyrighted advertising material;
> •    trademarked slogan; or
> •    trademarked title;
> of others in your advertising.

*Id.* at 43, 119.

## III.   Procedural History

Defendants timely provided notice of the Underlying Suit to St. Paul.[4] In a reservation of rights letter dated June 16, 2011, St. Paul denied any duty to defend Defendants under the Policy. Defs.' Cross-Mot. Summ. J. [#37] Ex. 1-6 at 583. *Id.* On October 4, 2011, Defendants responded to St. Paul, asserting that the Underlying Lawsuit was covered by the Policy and demanding benefits. *Id.* Ex. 1-H at 594–603. According to Defendants, St. Paul did not respond to this letter until January 14, 2014, when it again sent a letter denying coverage under the Policy. *Id.* Ex. 1-I at 604–19. St. Paul's basis for denying coverage under the Policy was the same in both denial letters: there is no coverage under the "advertising injury liability" provision because Perfect 10 did not allege Defendants used any of Perfect 10's copyrighted advertising materials in Defendants' advertising—and therefore did not allege a covered "advertising injury," as defined in the policy. *Id.* at 616.[5]

On February 2, 2015, St. Paul filed the instant action seeking a declaration it had no duty to defend Defendants in the Underlying Suit. *See* Compl. [#1]. On July 21, 2015, Defendants filed an answer alleging St. Paul wrongfully denied their claim for coverage and asserting counterclaims against St. Paul for breach of contract, breach of the duties of good faith and fair dealing, violations

---

[4] Defendants also tendered the Underlying Suit to Travelers Lloyds Insurance Company and AIG. Travelers Lloyds and St. Paul are wholly owned subsidiaries of The Travelers Companies. Based on allegations in the Underlying Lawsuit, Travelers Lloyds agreed to defend Defendants pursuant to a Cyber First Communications and Media Liability Form policy, which had a $50,000 deductible and $1,000,000 limit. *See* Pl.'s Mot. Summ. J. [#28-13] Ex. G at 520. Similarly, AIG agreed to defend Defendants pursuant to an Internet Media Liability Insurance Module, which also had a $1,000,000 deductible. *Id.* [#28-1] Ex. A at 3. The parties represent Defendants have spent approximately $8,000,000 litigating the Underlying Suit and have exhausted the policy limits under both the Travelers Lloyds and AIG policies. *See* Defs.' Cross-Mot. Summ. J. [#37] at 10.

[5] St. Paul also denied coverage under the Policy's "bodily injury," "property damage," and "personal injury" coverage agreements. *See* Defs.' Cross-Mot. Summ. J. [#37] Ex. 1-I at 616. These coverage provisions are not at issue in this suit.

of Chapters 541 and 542 of the Texas Insurance Code, and attorney's fees. *See* Answer [#6]. On March 13, 2016, St. Paul filed its motion for summary judgment as to all claims. *See* Pl.'s Mot. Summ. J. [#28]. On March 11, 2016, Defendants filed a response to St. Paul's motion and also moved for summary judgment as to all claims. *See* Defs.' Cross-Mot. Summ. J. [#37]. The cross-motions are fully briefed and ripe for consideration.

## Analysis

I.    **Summary Judgment—Legal Standard**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere

conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.     Insurance Policy Interpretation and the Eight-Corners Rule

"Under Texas law, insurance policies are construed as are contracts generally, and must be interpreted to effectuate the intent of the parties at the time the contracts were formed." *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 369 (5th Cir. 1993). "To determine an insurer's duty to defend, Texas courts follow the 'eight corners' rule." *CU Lloyd's of Tex. v. Main Street Homes, Inc.*, 79 S.W.3d 687, 692 (Tex. App.—Austin 2002, no pet.) (citing *Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997)). Applying the eight-corners rule, a court must "consider only the allegations in the underlying complaint and

the terms of the insurance policy to determine whether a duty to defend exists, giving the allegations in the petition a liberal interpretation and resolving any doubt in favor of the insured." *Id.* If the underlying petition does not allege facts that are potentially within the policy's coverage, then the insurer has no duty to defend. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006).[6]

## III. Application

### A. Did the Amended Underlying Complaint Allege Defendants Used Perfect 10's Advertising Material in its "Advertising"?

Applying the eight-corners rule, the Court must compare the Amended Underlying Complaint to the Policy and determine whether Perfect 10 alleged facts that are potentially within the Policy's coverage. It is undisputed the "intellectual property" exclusion bars coverage for damages arising from Perfect 10's copyright infringement claims unless such claims fall within the exception for

---

[6] In an extended footnote, Defendants ask the Court to look outside the eight corners of the underlying pleadings and the policy by considering subsequent motions, court orders, and other documents filed in the Underlying Suit, which they argue "further reinforce and confirm" St. Paul's duty to defend. *See* Defs.' Mot. Summ. J. [#37] at 12 n.5. First, Defendants argue the eight-corners standard is governed by California law, which requires the Court to consider extrinsic evidence if such evidence shows a potential for coverage. The court disagrees; Texas law applies to this dispute. Although the Underlying Suit was filed in California, the Policy—which consists of Texas forms—was issued through a Texas agent to Texas insureds, and insures risks nationwide. Applying Texas's choice-of-law rules, which compare the relationships between the instant dispute and each state, it is readily apparent this dispute is more closely related to Texas than to California. *See Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W.3d 337, 344 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (where policies "provide nationwide coverage, the place of contracting, the place of negotiation, the domicile, residence, nationality, place of incorporation, and place of business of the parties become the primary factors to determine which law applies"). The Court refuses to consider extrinsic evidence on the basis of California law. Second, applying Texas law, Defendants point to a "very narrow exception, permitting the use of extrinsic evidence" when, among other things, "it is initially impossible to discern whether coverage is potentially implicated." *See, e.g., GuideOne Mut. Ins. Co. v. Grace Christian Ctr. of Killeen, Texas, Inc.*, —F.3d—, 2015 WL 9839704, at *3 (W.D. Tex. 2015). However, Defendants admit the pleadings "already make clear" whether coverage is implicated and instead seek the consideration of extrinsic evidence for the purpose of "reinforcing" or "confirming" what can already be discerned from the pleadings. *See* Defs.' Mot. Summ. J. [#37] at 12 n.5; *id.* ("[T]he allegations in the pleadings, *by themselves*, bring the [Underlying Lawsuit] within the ambit of coverage" (emphasis added)). This is not an appropriate application of the exception. Finally, even the Court were to consider the extrinsic evidence put forth by Defendants, it would not alter the outcome of this coverage suit as the materials do not contain material information not already alleged in the underlying pleadings. Consequently, the Court refuses to stray from the eight corners of the underlying pleadings and the Policy to reach its decision.

"advertising injury that results from the unauthorized use of any: copyrighted advertising material; trademarked slogan; or trademarked title; of [Perfect 10's] in [Defendants'] advertising." *See* Policy at 43, 119.  The sole issue is whether the Amended Underlying Complaint alleged Defendants used any of Perfect 10's copyrighted materials in Defendants' "advertising."

      Construing the allegations in the Amended Underlying Complaint liberally and in favor of coverage, as the Court is obligated to do, the Court finds no allegations Defendants used any of Perfect 10's copyrighted advertising materials, slogan, or title in Defendants' own "advertising." Indeed, the underlying pleadings contain no accusations relating to the content of Defendants' advertising, let alone any allegations Defendants' advertisements contained materials that infringed Perfect 10's copyrights.[7]  Additionally, there are no allegations Defendants publicized, marketed, or promoted their businesses using any unauthorized reproductions of Perfect 10's copyrighted materials or otherwise solicited business using Perfect 10's content.  Rather, Perfect 10 alleges Defendants reproduced and displayed Perfect 10's copyrighted images on its users' computer screens *after* its users had already purchased a subscription, downloaded a newsreader application, entered a username and password, and performed a keyword search for Perfect 10 content.  These factual accusations do not state a claim for a covered advertising injury, as defined by the Policy.

      Defendants acknowledge the underlying pleadings do not expressly accuse them of using Perfect 10's copyrighted advertising materials in their advertising.  However, Defendants claim St. Paul skirted its contractual duty to defend because the underlying pleadings, construed liberally and

---

[7] While the Underlying Complaint alleged Giganews "has various advertising operations," the Amended Underlying Complaint omits this allegation and does not mention Defendants' "advertising operations" or otherwise include the word "advertising" with reference to Defendants. *Compare* Underlying Compl. ¶ 5 *with* Am. Underlying Compl. ¶ 5.  Even if the amended underlying pleadings had retained the reference to Defendants' "advertising operations," the Court still finds the allegations insufficient to state a covered "advertising injury."

in favor of coverage, at least *potentially* state a cause of action for a covered advertising injury. *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.–Tex.*, 249 F.3d 389, 391–93 (5th Cir. 2001). Defendants base this argument on the broad Policy definition of the term "advertising," which means "attracting the attention of others by any means for the purpose of: seeking customers or supporters; or increasing sales or business." Policy at 105. According to Defendants, the use of Perfect 10's copyrighted content constituted "advertising" because the images were "publicly displayed" or "offered" as a means of attracting (1) prospective customers to purchase new monthly subscriptions, or (2) current customers to purchase more expensive subscriptions.

The Court is not persuaded. Defendants' argument rests on the faulty premise the word "display" is synonymous with the word "attract." While "attract" is not defined in the Policy, the Oxford English Dictionary defines the term to mean "[t]o cause to come to a place or join in a venture by offering something of interest or advantage."[8] Reading the underlying pleadings as a whole, Perfect 10 alleges Defendants "displayed" or "offered" the images to its customers *after* they paid for a subscription and *after* the customers affirmatively chose to search for the offending images. Thus, by the time the images were "displayed" or "offered," the users' attention had *already* been attracted to Defendants' services. The alleged "public display" of Perfect 10 copyrighted images was not used as a tool to induce prospective customers "to come to" or "join in" Defendants business—the images were merely the product or service the customer had already purchased.

Similar logic applies to Defendants' argument the use of Perfect 10's copyrighted content constituted "advertising" because the images were "publicly displayed" or "offered" as a means of

---

[8] *Attract, v.*, OEDONLINE, June 2016, http://www.oed.com/view/Entry/12902?rskey=XGruZZ&result=2&isAdvanced=false#eid.

attracting current customers to purchase more expensive subscriptions. Again, the alleged "display" of Perfect 10's copyrighted images was the product or service a customer had contracted to receive in return for a monthly subscription fee, and there are no allegations the images caused current customers "to come to" or "join in" enhanced subscription services. Absent some allegation tying the copyrighted images to a solicitation for current customers to purchase additional services, the Court refuses to find the alleged "display" of Perfect 10's content took place in Defendants' "advertising." To find otherwise would transform the goods and services a customer purchases into "advertising" for future purchases, thereby converting an excluded claim for copyright infringement into a covered "advertising injury."[9] This was beyond the intent of the contracting parties.

Defendants also cite to *Mid-Continent Cas. Co v. Kipp Flores Architects, LLC*, 602 F. App'x 985, 992 (5th Cir. 2015), to support their position. In *Kipp Flores*, judgment was entered in favor of an architectural firm after a jury found a homebuilder built several hundred homes using the firm's copyrighted designs without permission. The Fifth Circuit concluded the homes qualified as "advertisements" under the CGL policy, and thus the alleged infringement of the designs occurred in Defendants' "advertising" for purposes of triggering "advertising injury" coverage. However, unlike in this case, it was "undisputed that [the homebuilder's] primary means of marketing its construction business was through the use of the homes themselves, . . . all of which were marketed to the general public." *Id.* In contrast to the homes in *Kipp Flores*, there are no allegations

---

[9] Tangentially, Defendants argue the infringement occurred in their advertising because Perfect 10 alleges current and prospective subscribers are drawn to subscribe exclusively based on the availability of pirated copyrighted works, including Perfect 10's advertising materials. *See* Am. Underlying Compl. ¶ 55 ("Defendants' ability to generate monthly subscriptions and revenues is based almost exclusively on the demand for pirated copyrighted works."). This argument fails for two reasons. First, allegations customers were drawn to subscribe to Giganews or Livewire are not specific to Perfect 10 but rather to "pirated copyrighted works" generally. Second, there are no allegations of the source of consumers' knowledge that Perfect 10 content can be accessed through Defendants' service. It is the source of knowledge that could potentially qualify as "advertising" under the Policy definition of the term, not the availability of the material itself.

Defendants marketed their respective businesses to the general public, or to current customers, through the unauthorized use of Perfect 10's copyrighted images.[10] Rather, the images were displayed after a user purchased a subscription and chose to conduct a search for Perfect 10 content. Again, these allegations do not state a claim for a covered "advertising injury." *Accord Gemmy Indus. Corp v. Alliance Gen. Ins. Co.*, 190 F. Supp. 2d 915, 919 (N.D. Tex. 1998) (finding claims for trade dress infringement related to the sale of knock-off novelty items covered "advertising activity" because "it was clear that plaintiff was sued for using this trade dress to 'call public attention' to its product"); *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F. Supp. 2d 611, 619 (S.D. Tex. 1999) (concluding claims for trade dress or trademark infringement constituted "advertising activity" based on allegations of "importation, *marketing* and/or sale of circuit breakers bearing the infringing reproduction[s] . . . and/or which bear or are packaged with infringing reproductions").

Finally, in a last-ditch effort to recoup the cost of defending the Underlying Suit, Defendants argue the Policy's definition of the term "advertising" is ambiguous and thus the Policy must be construed in favor of coverage. The Court disagrees. A provision is only ambiguous where the language is subject to more than one reasonable interpretation, not merely where, as here, the parties advance conflicting policy interpretations. *See, e.g., Kipp Flores*, 602 F. App'x at 989. Defendants do not offer any alternative constructions of the Policy term "advertising," and the Court finds their

---

[10] Defendants also argue the phrase "public display" refers to the "dissemination of the images to the general public," and not just to Defendants subscribers. Again, this argument ignores other allegations that the images were displayed only *after* a user purchased Defendants' subscription services. *See, e.g.*, Underlying Am. Compl. ¶¶ 23–32. There are no allegations suggesting Perfect 10's images were "open to general observation, view, or knowledge." *Public, n.*, OEDONLINE, June 2016, http://www.oed.com/view/Entry/154052?rskey=25TQHE&result=1&isAdvanced=false#eid.

interpretation of what falls within the scope of the term is not reasonable. The Court refuses to find St. Paul owed Defendants a duty to defend on this basis.

Even giving the Amended Underlying Complaint its most liberal interpretation, and defying the limits of common sense, there are simply no references to Defendants' advertising activities, let alone any allegation Defendants used Perfect 10's copyrighted advertising materials, title, or slogan in Defendants' own advertising. There are no allegations Defendants publicized the availability of Perfect 10 materials to attract or draw in prospective or current customers, provided samples of Perfect 10 content in any business solicitations, displayed Perfect 10 images to the general public on any of their webpages, or used Perfect 10's advertising material, title, or slogan in any of its promotional or marking materials. Consequently, because there are no allegations that can reasonably be read to allege Defendants' use of Perfect 10's materials in its advertising, the Court finds the Amended Underlying Complaint does not even *potentially* state a covered "advertising injury" claim. Summary judgment is thus due to be granted in St. Paul's favor.[11]

### B.   Defendants' Counterclaims

Under Texas law, "there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). The two exceptions to this rule are where an insurer "commit[s] some act, so extreme, that would cause injury independent of the policy claim" or fails "to timely investigate its insured's claims." *Id.*

---

[11] Having found the Amended Underlying Complaint did not potentially state a claim for a covered "advertising injury," the Court need not reach the issue of whether there is a causal connection between the injury and the "advertising activity." *See Kipp Flores*, 602 F. App'x at 991 (noting the district court's test for determining whether a policy covers "advertising injury" includes inquiry into the causal nexus between the alleged injury and alleged "advertising activity").

St. Paul argues Defendants' extra-contractual counterclaims must be dismissed because it Defendants' claim was not covered, and thus it owed Defendants no contractual duty to defend. In response, Defendants argue St. Paul did not timely investigate their claims, and that such failure constituted an act, so extreme, that caused injury independent of the policy claim because it led to their inability to settle the Underlying Suit in 2014.

Viewed in the light most favorable to Defendants, Defendants have produced no evidence of an extreme act that caused injury independent of the policy claim. In reaching this conclusion, the Court notes the Fifth Circuit's recent observation that "[t]he *Stoker* language has frequently been discussed, but in seventeen years since the decision appeared, no Texas court has yet held that recovery is available for an insurer's extreme act, causing injury independent of the policy claim." *See Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 709 F.3d 515, 521–22 (5th Cir. 2013). First, Defendants provide no evidence or argument substantiating their claim St. Paul's investigation was "untimely," and the summary judgment evidence before the Court suggests otherwise. Indeed, Defendants tendered the Underlying Suit to St. Paul on May 13, 2011, and received a response from St. Paul outlining its coverage position—which included an agreement to provide a defense under a related policy—on June 16, 2011. Second, even assuming Defendants had presented evidence the investigation was insufficient in some regard, they have presented no evidence of any injury independent of the policy claim. Consequently, summary judgment is due to be granted in favor of St. Paul with respect to Defendants' counterclaims.

## Conclusion

The Court concludes the Amended Underlying Complaint does not allege any unauthorized use of Perfect 10's copyrighted advertising materials, slogan, or title in Defendants' advertising.

Because the underlying pleadings did not state factual allegations potentially falling within the scope of a covered "advertising injury," St. Paul did not have a contractual duty to defend Defendants in the Underlying Suit, and summary judgment is due to be granted in their favor as to each claim.

Accordingly,

IT IS ORDERED that Plaintiff St. Paul Fire and Marine Insurance Company's Motion for Summary Judgment [#28] is GRANTED;

IT IS FURTHER ORDERED that Defendants Giganews, Inc. and Livewire Services, Inc.'s Cross-Motion for Summary Judgment and Response [#37] is DENIED;

IT IS FINALLY ORDERED that St. Paul Fire and Marine Insurance Company was not contractually obligated to defend Defendants Giganews, Inc. and Livewire Services, Inc. in *Perfect 10 Inc. v. Giganews, Inc. et al.*, 2:11-cv-07098-AB-JPR (C.D. Cal. filed Mar. 28, 2011).

SIGNED this the 17th day of June 2016.

/s/ Sam Sparks
SAM SPARKS
UNITED STATES DISTRICT JUDGE